**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

STACY CLYDE PALMER,

    Plaintiff,

v.

JOHN HULETT; M. McCLEOD; and JULIA HESTER,

    Defendants.

CIVIL ACTION NO.: 5:16-cv-39

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Presently before the Court are Plaintiff's and Defendants' Motions for Summary Judgment. (Docs. 31, 33.) Plaintiff filed a Response to Defendants' Motion. (Doc. 38.) Also before the Court are Plaintiff's Motion for Discovery Sanctions, Motion for Proposed Settlement, Motion in Limine, and Motion for Copy of the Docket Sheet and Subpoenas. (Docs. 29, 30, 42, 43.) For the reasons which follow, I **RECOMMEND** the Court **DENY** Defendants' Motion for Summary Judgment and **DENY** Plaintiff's Motion for Summary Judgment. The Court **DENIES** Plaintiff's Motion for Discovery Sanctions and Motion for Proposed Settlement, **DISMISSES as premature** Plaintiff's Motion in Limine, and **DISMISSES as moot** in part and **DISMISSES as premature** in part Plaintiff's Motion for Copy of the Docket Sheet and Subpoenas.

## BACKGROUND

Plaintiff became an inmate at Coffee Correctional Facility in December 2015, during which time he underwent an intake screening by Defendant Hulett.[1] (Doc. 38, p. 1.) Prior to arriving at Coffee Correctional, Plaintiff used corrective lenses for astigmatism in each eye, and he renewed this prescription every three to five years. (Id.) Plaintiff complained during his intake about having diminished vision and pain in his right eye. (Id. at p. 2.) Plaintiff submitted a health services request form on December 21, 2015, and stated he needed to see the eye doctor, an examination, and glasses. According to Plaintiff, this request was worded to show it was made due to pain and diminishing vision he experienced. Defendant Hester responded to the request by writing "opto" and later wrote an appointment had been scheduled. (Id.) However, Plaintiff's appointment was cancelled on the spot, despite Plaintiff informing medical staff he was experiencing pain and pressure in his eye, he was blind, and it was an emergency. Plaintiff informed Defendant McCleod during a follow-up visit for his seizures that he lost vision in his right eye, but Defendant McCleod wrote that Plaintiff was experiencing problems in his left eye. (Id.)

Plaintiff submitted another health services request form on February 16, 2016, and stated he was having problems with his right eye, had pressure in it, and could not see out of the side of his right eye. (Id. at p. 3.) Defendant Hester wrote "opto" on the form. In addition, Plaintiff submitted yet another health services request form on March 9, 2016. In this request, Plaintiff stated he had made several previous requests and he was completely blind in his right eye, and he asked to see a doctor. (Id.) He was informed that his concerns had already been addressed. Plaintiff then filed a grievance on March 23, 2016, and complained about the delay in medical

---

[1] Although Plaintiff has filed his own Motion for Summary Judgment, the Court views all evidence and facts in the light most favorable to him.

staff examining him regarding the blindness in his right eye and again stated he had an emergency. (Id.) Defendant Hulett examined Plaintiff using an ophthalmoscope and a Snellen eye chart. (Id. at p. 4.) Plaintiff had an appointment with Dr. Neal Lovett scheduled for April 1, 2016. (Doc. 39, p. 6.)

During treatment for an unrelated medical problem on March 31, 2106, Defendant McCleod examined Plaintiff's eye, and that examination revealed Plaintiff had no vision in his right eye and could only see "black[.]" (Id.) Plaintiff saw Dr. Lovett the next day, who diagnosed Plaintiff with retinal detachment of his right eye and who made an appointment with Dr. Robert King at the Georgia Eye Institute for April 11, 2016. Dr. King confirmed Dr. Lovett's diagnosis, told Plaintiff he may need surgery, and explained the benefits and risks associated with the surgery. (Id. at p. 7.) Plaintiff verbally declined to go forward with the surgery on April 15, 2016, and later reduced his decision to writing on April 27, 2016. (Id. at p. 8.) Plaintiff has not had surgery to correct his right eye problems, as the risks of surgery outweigh the small chance of success the surgery could provide. (Id.)

In their Motion for Summary Judgment, Defendants assert Plaintiff cannot show they were subjectively aware of his serious medical need or that they were deliberately indifferent to that need. (Doc. 33-3, p. 7.) Instead, Defendants allege there is nothing in the record indicating Plaintiff or medical staff at Coffee Correctional considered Plaintiff's right eye issue to be an urgent matter until March 23, 2016. At that time, Defendants contend Plaintiff complained of right eye pain and blindness and was examined and scheduled for an optometry appointment the following week. (Id.) Defendants aver that, once they were aware of Plaintiff's serious medical need, they (and other members of the medical staff) "acted swiftly and appropriately to treat Plaintiff's condition." (Id. at p. 8.)

Plaintiff states Defendants were deliberately indifferent to the pain he experienced in his right eye and that the delay in treatment caused the loss of vision in his right eye. (Doc. 31, p. 5.) Plaintiff maintains his loss of vision could have been avoided had Defendants treated his eye in a prompt manner when he first informed Defendants of the pain in his eye in December 2015. (Id. at pp. 5–6.) Plaintiff asserts the optometrist and Dr. King both told him that, had they examined Plaintiff in December 2015 or January 2016, they could have saved his vision. (Id. at pp. 6–7.)

Prior to addressing summary judgment issues, the Court addresses the other Motions Plaintiff filed.

## DISCUSSION

### I. Plaintiff's Motion for Discovery Sanctions (Doc. 29)

Plaintiff asserts Defendants' counsel came to Coffee Correctional on May 19, 2017, to take his deposition. However, Plaintiff alleges he was not given notice prior to being taken for this deposition. (Doc. 29, p. 1.) Plaintiff also alleges he received a letter from Defendants' counsel on May 22, 2017, which was dated May 18, 2017, and noticed his deposition for May 19, 2017. (Id. at p. 2.) Plaintiff asserts Defendants' counsel did not provide him with reasonable notice of the deposition and, as a result, the Court should strike Plaintiff's deposition testimony.

The Court **DENIES** Plaintiff's Motion. The Court accepts as true Plaintiff's assertion that he did not receive notice of the deposition until three (3) days after it occurred. (Doc. 33-2.) However, the Court's review of the transcript of Plaintiff's deposition reveals Plaintiff voiced no objection to the timing of the notice of his deposition or to the taking of his deposition. See Bracey v. Price, Civil Action No. 09-1662, 2012 WL 6015727, at *2 n.1 (W.D. Pa. Dec. 3, 2012) (denying plaintiff's motion to strike deposition based, in part, on claim of no advance notice of the deposition, as required by Federal Rule of Civil Procedure 30(b)(1)). Thus,

Plaintiff cannot now object to having failed to receive reasonable notice of his deposition without having done so during the taking of his deposition. Fed. R. Civ. P. 30(c)(2) ("An objection at the time of the examination—whether . . . to the manner of taking the deposition, or to any other aspect of the deposition—must be noted on the record, but the examination still proceeds.")

## II.     Plaintiff's Motion for Proposed Settlement (Doc. 30)

In his Motion for Proposed Settlement, Plaintiff reiterates many of the assertions set forth in his Motion for Discovery Sanctions. Additionally, Plaintiff maintains he should be awarded compensatory and punitive damages in the amount of $2,699,968.25 due to the physical injury he suffered as a result of Defendants' deliberate indifference to his serious medical needs. (Doc. 30, pp. 10, 12–13.) Plaintiff represents he will sign a confidentiality agreement upon approval of this settlement and the payment of these funds. (Id. at p. 13.)

The Court **DENIES** Plaintiff's Motion. While Plaintiff is free to make an offer of settlement to Defendants, he need not file a Motion to do so. In addition, the Court is under no obligation to order Defendants to enter into an agreement of settlement. Should this Report and Recommendation be adopted as the opinion of the Court, the parties are free to enter mediation through a private mediator or through the Court or proceed to trial.

## III.    Plaintiff's Motion in Limine (Doc. 42)

Plaintiff contends that Defendants' counsel asked many irrelevant questions relating to his personal life and his criminal record during his deposition. Plaintiff seeks to have certain portions of his deposition testimony excluded from the trial of his case. (Doc. 42, pp. 1–2.)

The Court **DISMISSES as premature** Plaintiff's Motion at this time. Should this case proceed to trial, Plaintiff may re-urge his Motion at a more appropriate time.

**IV.     Motion for Docket Sheet and Subpoenas (Doc. 43)**

Through this Motion, Plaintiff seeks a copy of the docket sheet in this case, as well as witness subpoenas in the event of trial in this case.

The Clerk's Office mailed a courtesy copy of the docket sheet to Plaintiff on December 22, 2017, and there is no indication this mailing was returned to the Court or otherwise failed to reach Plaintiff. The Court **DISMISSES as moot** this portion of Plaintiff's Motion, as the only filings on the docket after December 22, 2017, is another letter from Plaintiff and a notice of appearance. (Docs. 48, 49.) Should this case proceed to trial, Plaintiff can request that the Court re-visit his requests for witness subpoenas. Accordingly, the Court **DISMISSES as premature** this portion of Plaintiff's Motion.

**V.     Summary Judgment**

   **A.     Standard of Review**

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, there must exist a conflict in substantial evidence to pose a jury question." Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); and Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party

must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." See Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).

### B. Deliberate Indifference to Medical Needs

Plaintiff's claims against Defendants require analysis and discussion under the Eighth Amendment of the United States Constitution. The Eighth Amendment's proscription against cruel and unusual punishment imposes a constitutional duty upon prison officials to "ensure that inmates receive adequate food, clothing shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994). However, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Estelle v. Gamble, 429 U.S. 97, 105 (1976)). Rather, "an inmate must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106. In order to prevail on a deliberate indifference claim, a prisoner must: (1) satisfy the objective component by showing a serious medical need; (2) satisfy the subjective component by showing a defendant's deliberate indifference to that

need; and (3) show that the injury was caused by the defendant's indifference. Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007).

As to the first, objective component, a medical need is serious if it "'has been diagnosed by a physician as mandating treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187). In either situation, the medical need must be "one that, if left unattended, 'poses a substantial risk of serious harm.'" Farrow v. West, 320 F.3d 1235, 1246 (quoting Farmer, 511 U.S. at 834).

Under the second, subjective component, the Eleventh Circuit Court of Appeals has consistently required that "a defendant know of and disregard an excessive risk to an inmate's health and safety." Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995). Thus, the subjective component requires an inmate to prove: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016).[2]

"Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011). Additionally, a defendant who "delays necessary treatment for non-medical reasons" or "knowingly interfere[s] with a physician's prescribed course of treatment" may exhibit

---

[2] Eleventh Circuit case law on whether a claim of deliberate indifference requires "more than *gross* negligence" or "more than *mere* negligence" is contradictory. Compare Goebert, 510 F.3d at 1327, with Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011). In Melton, the Eleventh Circuit found "more than mere negligence" to be the appropriate standard. 841 F.3d at 1223 n.2. Even so, at least two Eleventh Circuit unpublished cases post-Melton have continued to use the "gross negligence" standard. See, e.g., Woodyard v. Ala. Dep't of Corr., 2017 WL 2829376 (11th Cir. June 30, 2017); Sifford v. Ford, 2017 WL 2874517 (11th Cir. July 6, 2017). However, because the Eleventh Circuit explicitly addressed this issue in Melton, this Court will apply the "more than mere negligence" standard.

8

deliberate indifference.  Id. (citations omitted).  In instances where a deliberate indifference claim turns on a delay in treatment rather than the type of medical care received, the Court considers "the reason for the delay and the nature of the medical need." Farrow, 320 F.3d at 1246 (citing McElligott, 182 F.3d at 1255).  When a claim turns on the quality of treatment provided, however, "'a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment' does not support a claim of deliberate indifference." Melton, 841 F.3d at 1224 (quoting Harris, 941 F.2d at 1505).  In other words, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 104.  Furthermore, deliberate indifference is not established when an inmate receives medical care, but "may have desired different modes of treatment." Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (11th Cir. 1985).

Plaintiff contends that Defendants were deliberately indifferent to the serious medical needs he was experiencing relating to his right eye.  According to Plaintiff, Defendants' delay in treating his eye condition caused the loss of vision in his right eye.  (Doc. 31, p. 5.)  Plaintiff maintains that, had Defendants treated his eye condition when he began complaining about having pain in his right eye in December 2015, his loss of vision could have been prevented.  (Id. & at p. 6.)  Plaintiff avers he saw Dr. Lovett on April 1, 2017, and Dr. Lovett told Plaintiff that Dr. Lovett could have saved Plaintiff's vision had he seen Plaintiff during the last week of December 2015 or the first week of January 2016.  In addition, Plaintiff states Dr. King also told him he could have saved Plaintiff's vision if he had seen Plaintiff the first week of January 2016.  (Id. at pp. 6–7.)  Plaintiff alleges Dr. King's recommended surgery was no guarantee that Plaintiff could have restored vision in his right eye or that he would not require any additional surgeries.  (Id. at p. 7.)

Defendants assert Plaintiff had an intake screening with medical staff at Coffee Correctional on December 10, 2015, at which time Plaintiff failed to complain about his right eye, per the medical records. (Doc. 33-3, p. 1.) Defendants also assert Plaintiff's medical records revealed a history of seizures, dental complaints, mental health issues, and his use of corrective lenses for astigmatism in each eye. (Id.) Defendants assert Plaintiff submitted a health services request on December 21, 2015, and stated he needed an eye examination and glasses, but he did not mention he was partially blind in his right eye. Defendants assert Plaintiff complained of loss of vision in his left eye in early January 2016, but, according to Defendants, Plaintiff did not complain about blindness in his right eye until March 23, 2016. (Id. at p. 2.)

Defendants note Plaintiff saw Dr. Lovett on April 1, 2016, and reported to Dr. Lovett he only had half vision in his right eye. Defendants maintain Dr. Lovett examined Plaintiff, diagnosed him with right eye retinal detachment, and referred Plaintiff to see an outside specialist. (Id. at p. 3.) Defendants aver Dr. King with the Georgia Eye Institute examined Plaintiff on April 11, 2016, and confirmed Dr. Lovett's diagnosis. Defendants also aver Dr. King told Plaintiff he may need surgery to correct the detachment, explained the possible benefits and risks associated with surgery, scheduled the surgery for April 28, 2016, and prescribed Plaintiff eye drops for use after the surgery. Defendants assert Plaintiff verbally declined to go forward with the recommended surgery on April 15, 2016. (Id.) Additionally, Defendants note the day before the scheduled surgery, Plaintiff refused any further treatment for his right eye, even after medical staff advised Plaintiff of the risks and benefits of his refusal to go through with the recommended surgery.

Defendants assert that Plaintiff agrees that any problem with his vision is a subjective condition, which means that the medical care providers had to rely on Plaintiff's historical

information to treat his eye condition. (Id. at p. 4.) Defendants allege the medical records do not support Plaintiff's assertion that he told the intake physician in December 2015 of his partial blindness. Rather, Defendants assert the medical records reveal Plaintiff first began having partial blindness in February 2016, which is more than a month before he filed the March 23, 2016, health request form complaining about blindness in his right eye. (Id.) Defendants also assert Dr. King's medical records do not reveal that he could have saved Plaintiff's vision in his right eye if he had treated Plaintiff earlier, and Dr. King's records do reveal that Plaintiff relayed he had partial vision in his right eye through February 2016. (Id.) Additionally, Defendants note Plaintiff can identify "no specific wrongdoing" on any of their parts and is not sure how Defendants "fit into his treatment" at Coffee Correctional.[3] (Id. at pp. 4–5.)

Further, Defendants aver that, once Plaintiff complained about pain and blindness in his right eye, medical staff scheduled an appointment with Dr. Lovett. Once Dr. Lovett diagnosed Plaintiff with a detached retina, Defendants argue he was treated with urgency, including recommended surgical intervention, which Plaintiff declined. (Id. at p. 8.) Defendants state Plaintiff cannot demonstrate he had a serious medical need prior to March 23, 2016, or that medical staff disregarded the risk of harm Plaintiff faced once they were aware of Plaintiff's complaints. Moreover, Defendants maintain that, even if medical staff had been aware of Plaintiff's eye problems in December 2015, Plaintiff cannot establish that any perceived delay in obtaining treatment exacerbated his condition. (Id.)

---

[3] Plaintiff was not sure which Defendant was responsible for what actions during his deposition. (Doc. 33-2, pp. 45–46, 50.) However, Plaintiff also stated he would have to go back to look over his paperwork to be sure of each Defendant's role. (Id. at pp. 46, 49.) Plaintiff was able to respond to Defendants' Motion for Summary Judgment and specified which Defendant was responsible for his alleged lack of treatment on what date. What is more, the Court was able to glean these specifics from Plaintiff's medical records and the transcript from his deposition.

The record before the Court, including Plaintiff's medical records and his deposition transcript, reveals the following facts regarding Plaintiff's right eye condition. Plaintiff has astigmatism in each eye and has worn eyeglasses for several years due to this condition. (Doc. 33-2, pp. 22–23, 27.) Plaintiff receives a new pair of glasses every three to five years. (Id. at p. 27.) Plaintiff arrived at Coffee Correctional on December 10, 2015, and Defendant Hulett entered information on Plaintiff's Initial Intake Screening. (Doc. 33-1, p. 1.) Plaintiff's need for eyeglasses and his history of seizures, dental complaints, and mental health issues were noted, but there was no notation regarding reported vision problems in Plaintiff's right eye. (Id. at pp. 1–12.) However, Plaintiff testified during his deposition that he informed Defendant Hulett upon his arrival at Coffee Correctional that his right eye was different from his left eye, he had spots in his right eye, and he could not "really see good[.]" (Doc. 33-2, p. 29.) Defendant Hulett told Plaintiff he would put him in for an appointment with the optometrist, but this did not occur. (Id. at pp. 29–30.)

On December 21, 2015, Plaintiff submitted a health services request form in which he stated he wished to be seen by an eye doctor because he needed an exam and glasses. (Id. at p. 32.) Defendant Hester responded the next day that an "opto" appointment was scheduled. (Doc. 33-1, p. 60.) Defendant McCleod recorded Plaintiff's complaint of loss of vision in his left eye on January 4, 2016. (Id. at p. 9 (emphasis added).) Plaintiff reported on March 23, 2016, that he could not see out of his right eye and did not know what was wrong. Plaintiff reported having "sudden change in visual acuity" and "blurred vision[.]" (Id. at p. 23.) In addition, Plaintiff submitted a grievance form dated March 21, 2016, in which he stated he had been trying to obtain medical attention for his eyes since he arrived at Coffee Correctional in December 2015. Plaintiff asserted in his grievance that he had submitted at least three requests to be seen

in medical and that he was completely blind in his right eye.[4]  (Id. at p. 181.)  In fact, Plaintiff stated during his deposition that his symptoms were getting worse approximately a month after he arrived at Coffee Correctional, and he put in another medical request, but the only thing staff would tell him was that an appointment with the optometrist had been made.  (Doc. 33-2, pp. 29–30.)  Plaintiff also stated he submitted two more medical requests before March 2016, including one in February 2016 in which he stated he had lost vision in his right eye.  (Id. at pp. 30, 48.)

Plaintiff was examined on March 23, 2016.  (Doc. 33-1, pp. 24, 185.)  Based on Plaintiff's vision changes within the last month, Defendants Hulett and McCleod scheduled an appointment with Dr. Lovett, the optometrist, for April 1, 2016.  (Id. at p. 25.)  Plaintiff had a follow-up visit on March 31, 2016, and complained of his right eye vision being "black[.]"  (Id. at p. 27.)  Plaintiff was again given an examination.[5]  (Id. at p. 28.)

Dr. Lovett examined Plaintiff's eyes on April 1, 2016.  Dr. Lovett noted Plaintiff could only see the "upper half of vision" and saw flashes, floaters, and blurred vision when he first experienced problems with his vision, and that this had been happening for three months, or beginning in January 2016.  (Id. at pp. 36, 38; Doc. 33-2, pp. 34–35.)  Dr. Lovett diagnosed Plaintiff with having a detached retina in his right eye.  (Doc. 33-1, pp. 36, 38.)  He then made a referral request for Plaintiff to have an office visit with another eye doctor on an outpatient basis.

---

[4] The Warden's response to Plaintiff's Grievance Number 215529 is dated April 4, 2016, and advised Plaintiff that he was given an eye assessment and had an appointment with an optometrist, so no further action was warranted.  (Doc. 33-1, p. 187.)  Plaintiff received this response on April 12, 2016, and he filed an appeal the same day.  (Id. at pp. 188, 189.)  Plaintiff filed another grievance dated April 4, 2016, and stated his loss of vision and pain in his right eye complaints had been documented since December 2015.  (Id. at p. 192.)  Plaintiff also stated the optometrist told him that he could have saved Plaintiff's sight had the optometrist seen Plaintiff in December 2015.  Grievance Number 216450 was rejected because the issue had already been addressed and because Plaintiff did not set forth a clear requested resolution.  (Id. at p. 193.)

[5] During his deposition, Plaintiff asserted he had an appointment with the optometrist, perhaps near the end of March 2016, and that appointment was cancelled when Plaintiff arrived at the optometrist's office due to overbooking.  (Doc. 33-2, p. 30.)

(Id. at p. 38.) Dr. Lovett told Plaintiff that there was only a slim chance he would get his vision back due to "the period of time that ha[d] passed[.]" (Doc. 33-2, p. 31.)

Plaintiff reported to Dr. King on April 11, 2016, that he started having "floaters that looked like pepper" in his right eye in December 2015 and that he barely had light perception vision since February 2016. (Doc. 33-1, p. 45.) After examination, Dr. King diagnosed Plaintiff with a total retinal detachment to his right eye. (Id. at pp. 46, 47.) Dr. King discussed with Plaintiff that he risked blindness if he decided to forego surgical treatment for his condition, and he also discussed with Plaintiff that he could experience "limitation in final visual acuity even with successful surgery due to foveal[6] involvement." (Id.) Dr. King further discussed the specific risks and benefits of the proposed procedure, which was scheduled for April 28, 2016. (Doc. 33-2, p. 38). Dr. King informed Plaintiff that, at most, he may be able to see the fingers on his hand up close, but "too much time had passed and tissue was damaged beyond repair[]" for Plaintiff to have any more vision restored. (Id. at pp. 31, 38.) Dr. King told Plaintiff the surgery would be to relieve the pressure Plaintiff had in his eye but would not be restorative to his vision. (Id. at pp. 42–43.) Dr. King also told Plaintiff that, had he seen Plaintiff when he first started experiencing problems in his right eye, he could have restored Plaintiff's vision. (Id. at p. 43.)

On April 15, 2016, Plaintiff saw Dr. Lovett again. Dr. Lovett noted that Dr. King recommended Plaintiff undergo surgery. Nevertheless, Plaintiff expressed his understanding of the risks of not having surgery and verbally declined surgical treatment. (Doc. 33-1, p. 49.) Plaintiff received new eye glasses on April 19, 2016. (Id. at p. 112.) On April 27, 2016, the day before his scheduled surgery, Plaintiff informed medical personnel at Coffee Correctional that, after speaking with his family and an attorney, he refused any future treatment on his eye. (Id. at

---

[6] The fovea is a small depression or pit "located in the macula [(or central area)] of the retina that provides the clearest vision of all." https://www.medicinenet.com/script/main/art.asp?articlekey=24120 (last visited Feb. 5, 2018).

14

pp. 69; 112.) Medical staff advised Plaintiff that he would continue not being able to see out of his eye if he did not have the surgery, and Plaintiff responded that the doctor "said that he probably would not get his eye sight back anyway." (Id. at p. 69.) Plaintiff declined to go through with the surgery because the trauma he would experience from the surgery would likely outweigh the minor gains he would make. (Doc. 33-2, p. 41.)

There is no dispute between the parties that Plaintiff's loss of vision can be considered a serious medical need. Trahan v. Reinkens, Civil Action No. H-05-0173, 2007 WL 2142075 (S.D. Tex. July 25, 2017). There is also no dispute that, once Defendants claim they became aware of Plaintiff's problems with his right eye and vision on March 23, 2106, they worked quickly and efficiently to address Plaintiff's medical needs.[7] (See, e.g., Doc. 33-1, p. 185.) Further, there is no dispute that Plaintiff declined to have surgery on his right eye, which may have improved his vision. (Id. at p. 112.)

However, there are genuine disputes as to whether: Defendants were made aware of problems Plaintiff was experiencing in his right eye as early as December 2015, because Plaintiff claims he informed Defendant Hulett upon his arrival at Coffee Correctional on December 10, 2015, that he was having problems with his vision in his right eye; Plaintiff informed Defendant Hester on December 21, 2015, that he was having vision problems; Plaintiff informed Defendant McCleod that he experienced loss of vision in his right eye on January 4, 2016, and she instead wrote down Plaintiff complained about problems in his left eye; Dr. King told Plaintiff he could have saved his vision had Plaintiff come to see him when he began experiencing problems with his right eye; Defendants delayed obtaining treatment for Plaintiff's right eye condition by more

---

[7] Plaintiff does not appear to dispute this point. Rather, Plaintiff disputes that Defendants were unaware of problems he reported to them prior to March 23, 2016, and Defendants' actions (or inaction) in response to his allegedly reported problems.

15

than mere negligence; and any alleged delay in obtaining treatment exacerbated Plaintiff's condition.

Specifically, there is no evidence before the Court indicating that Plaintiff saw the optometrist within a reasonable time after his alleged December 21, 2015, request or that Plaintiff's complaint about the loss of vision on January 4, 2016—no matter in which eye—was addressed. (Doc. 33-1, p. 12.) A reasonable jury could find that Defendant McCleod was deliberately indifferent to Plaintiff's eye and vision problems as early as January 4, 2016, given the lack of documentation supporting the provision of any medical care or treatment in response to Plaintiff's complaint at that time.

The Court notes Defendants' assertion that Dr. King's alleged verbal statements to Plaintiff are not in Dr. King's written records and are inadmissible hearsay. (Doc. 33-3, p. 8.) "The general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'" Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005) (quoting Macuba v. Deboer, 193 F.3d 1316, 1322–23 (11th Cir. 1999)). "Rule[s 56(c) and] 56(e) of the Federal Rules of Civil Procedure requires that 'affidavits' that support or oppose summary judgment motions 'shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence[.]' This rule also applies to testimony given on deposition." Id. (second alteration in original) (quoting Macuba, 193 F.3d at 1322–23, in turn citing Randle v. LaSalle Telecomms., Inc., 876 F.2d 563, 570 n.4 (7th Cir. 1989)). A "nonmoving party, in opposing a motion for summary judgment, need not produce affidavits, but may refer the district court to 'pleadings, depositions, answers to interrogatories, and admissions on file,' as provided by Fed. R. Civ. P. 56(c)." Id. "This is not to say, however, that evidence submitted during the summary judgment stage need be in an admissible form at that time." See id. (citing Macuba, 193 F.3d at

1324–25). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." Jones v. UPS Ground Freight, 683 F.3d 1283, 1294 (11th Cir. 2012) (citing Pritchard v. S. Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996) (noting that an affidavit "can be reduced to admissible form at trial" by calling the affiant as a witness)).

A plaintiff must demonstrate that a defendant's responses to his medical needs were poor enough to constitute an unnecessary and wanton infliction of pain and not merely accidental inadequacy, negligence in treatment, or even medical malpractice actionable under state law. Gipson v. Renninger, No. 3:15-CV-827-J-39PDB, 2017 WL 4124759, at *10 (M.D. Fla. Sept. 18, 2017) (citing Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000)). "'Where the seriousness of a prisoner's need[] for medical care is obvious even to a lay person,' this obviousness is itself sufficient to satisfy the objective component of the adequate medical care test." Johnson v. Karnes, 398 F.3d 868, 874 (6th Cir. 2005) (brackets in original) (quoting Blackmore v. Kalamazoo Cty., 390 F.3d 890, 899 (6th Cir. 2004)). "However, if the need involves minor maladies or non-obvious complaints of a serious need for medical care, the inmate must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." Id. (internal citations and punctuation omitted).

Here, Plaintiff testified during his deposition and alleged in his pleadings that Drs. Lovett and King would testify that, had he come to see them when he first reported problems with his vision, his vision could have been restored. (Doc. 31, pp. 6–7; Doc. 33-2, pp. 31, 42–44). While, at the moment, these alleged statements are hearsay and are not contained in the medical record before the Court, these statements can be "reduced to admissible form at trial", if Plaintiff were to call these doctors as witnesses during the trial of this case and these doctors testified in

17

the manner Plaintiff contends.[8] Accordingly, these statements could become Plaintiff's "verifying medical evidence" in support of his averments that Defendants delayed his treatment for his eye condition to the point of exacerbation of his condition.[9] A reasonable jury could conclude that Plaintiff had a serious medical need regarding his right eye as early as December 2015 or January 2016, Defendants were aware of this serious medical need, and Defendants were deliberately indifferent to that need. Additionally, a reasonable jury could conclude that Defendants delayed obtaining treatment for Plaintiff's right eye condition and that this delay exacerbated his condition. Accordingly, the Court should **DENY** the parties' dueling Motions for Summary Judgment.

## CONCLUSION

Based in the foregoing, I **RECOMMEND** the Court **DENY** Defendants' Motion for Summary Judgment and **DENY** Plaintiff's Motion for Summary Judgment. The Court **DENIES** Plaintiff's Motion for Discovery Sanctions and Motion for Proposed Settlement, **DISMISSES as premature** Plaintiff's Motion in Limine, and **DISMISSES as moot** in part and **DISMISSES as premature** in part Plaintiff's Motion for Copy of the Docket Sheet and Subpoenas.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within fourteen (14) days of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the Complaint must also be included. Failure to do so will bar any later

---

[8] Of course, at trial, these doctors may testify differently than Plaintiff contends. However, given the state of the record in this case, Plaintiff should at least have the opportunity to present his case to a jury. A reasonable jury would then have to decide the questions of fact noted above, including when Plaintiff advised Defendants of his problems with his right eye, decide whether Defendants' responses fit the legal standard of deliberate indifference to a serious medical need, and, what, if any damage Defendants' actions or inaction caused.

[9] The Court notes Defendants' averment that Plaintiff agreed that his eye condition was a subjective condition. (Doc. 33-3, p. 4.)

challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action. The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge. The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon the parties.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 9th day of February, 2018.

_____
R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA